# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 15, 2010

## STATE OF TENNESSEE v. BENNIE E. MASSEY

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40700622    John H. Gasaway, III, Judge**

---

**No. M2009-00824-CCA-R3-CD - Filed January 9, 2011**

---

Following a Montgomery County bench trial, the Defendant, Bennie E. Massey, was convicted of five counts of sexual battery by an authority figure, a Class C felony, and sentenced to six years, to be served on probation. The trial court also ordered the Defendant to serve forty-eight hours in jail every two weeks for the first year of his sentence. On appeal, the Defendant contends that the evidence is insufficient to support his convictions because the evidence presented by the State is based solely upon the victims' testimony and those victims, he asserts, are accomplices to the sexual battery in that they consented to the unlawful touching. Further, he asserts that the trial court improperly imposed consecutive sentencing. After a thorough review of the record and applicable law, we conclude that the victims were not accomplices, in that their consent was coerced by the Defendant, and that the evidence, therefore, supports the Defendant's convictions. We further conclude that the trial court properly sentenced the Defendant. As such, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

Roger E. Nell, Clarksville, Tennessee (on appeal), Sarah R. King Clarksville, Tennessee (on appeal) and Collier W. Goodlett, Clarksville, Tennessee (at trial) for the appellant, Bennie E. Massey.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and John Finklea, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION
## I. Facts

This case arises from the Defendant's sexual contact with his two minor biological daughters. Based upon this conduct, a Montgomery County grand jury indicted the Defendant for five counts of sexual battery by an authority figure.

## A. Trial

The following evidence was presented at the Defendant's bench trial: The Defendant's younger daughter, T.M.[1], testified that she spent the first nine years of her life living with her maternal grandparents. At age nine, she moved into her parents' home, where she stayed until the summer of 2007, when, at age fourteen, she was removed from their home due to her father's conduct. At the time of trial, she had resumed living with her maternal grandparents.

T.M. testified that the Defendant first had sexual contact with her during the summer of 2006, when she was thirteen. During this time, both she and her elder sister were living in their parents' home, but she had a room to herself. One afternoon that summer, she made plans to meet friends to see a movie, and she began getting ready in her bedroom. At this time, she and her father were the only people present in the house.

As T.M. stood facing her mirror and away from the door, wearing only her bra and underwear, she saw in her mirror that her father had entered her bedroom. Without speaking, he approached T.M. from behind, unfastened her bra, and began touching her breasts. T.M. was "shocked" to the point that she did not "know what to do." She explained at trial why she froze rather than say anything to her father: "I couldn't. I was in so much shock I just couldn't do anything."

As the Defendant continued touching his daughter's breasts, T.M. heard what she believed was a car door shutting outside, so she pushed her father away, telling him that she had just heard her mother and sister return home. Hearing this, her father walked out of the room. T.M. cried. At trial, she recalled that she "never thought he would do something like that." Eventually, she finished getting dressed. When she went downstairs, the Defendant "acted like nothing ever happened," so T.M. "just went along with it." She told her family goodbye and left to see the movie with her friends.

---

[1]It is the policy of this court to refer to victims of sexual abuse by their initials only.

2

The Defendant again initiated sexual contact with T.M. on April, 8, 2007, when T.M. was fourteen. On this occasion, both her mother and sister were home. As T.M. was showering, her father entered the bathroom, explaining that he needed to wash his hands. She heard the sound of water running as he washed his hands and what she believed to be the door shutting as he left. However, as T.M. reached for a bottle on the side of the tub, her father "jerked" the shower curtain open, touched T.M.'s breast, and started to move his hand down her stomach. T.M. quickly "threw" the Defendant's hands from her body and told him to "leave [her] alone." The Defendant walked out. T.M. finished showering, wrapped herself in a towel, and went to her room. Four days later, she reported her father's behavior to a teacher after which she was removed from her parents' home. The Defendant and T.M. never spoke about his behavior.

On cross-examination, T.M. explained that she did not call out to her mother for help when her father touched her while she was showering because she "was in shock." She testified that she was not dating anyone in the summer of 2006 when her father first had sexual contact with her. She said she was, however, dating someone in April 2007 when her father sexually contacted her again. T.M. confirmed that, at some point between the ages of nine and fourteen, "an incident occurred" when she refused to go home with her sister who had been sent to bring her home and that another "incident occurred" when she refused to go home when her mother insisted that she return home. She denied any incident involving her father finding her at a boyfriend's house and forcing her to return home.

Officer Joshua Wall testified that he interviewed the Defendant as part of the investigation of these charges against the Defendant. During this interview, the Defendant denied ever having intentionally inappropriately touched either daughter. He allowed, however, that he may have "accidentally" touched their breasts when "play[ing] around" and "wrestl[ing]" with them. When the officer questioned him about the specific allegation that he touched T.M. while she showered, the Defendant said that, although he did walk into the bathroom while T.M. was showering, he did not touch her.

A.M., who was twenty years old at the time of trial, testified that she lived with their grandparents until age fifteen, when she moved into her parents' home. At her parents' home, A.M. initially shared a bedroom with her sister, but, due to their constant fighting, she moved into the family's dining room, which served as her bedroom for the remainder of the time she lived with her parents.

A.M. testified the Defendant first inappropriately touched A.M. during the summer of 2005, when she was fifteen. The first time this occurred, she was in her makeshift room in the dining room. Earlier that evening, A.M. had asked her mother for permission to see a movie with friends, but her mother refused, citing the late hour. A.M., however, still hoped

to convince her parents to let her see the movie, and she began to get ready to leave in her room. As she sat on her bed, getting ready and listening to the radio, the Defendant entered the room. The two began discussing her request to see a movie and the fact that it was quite late for her to leave the house. The Defendant proposed a deal. He said, "if I do this for you will you do this for me? . . . [W]ould you let me touch you?" A.M. initially thought her father was joking but soon realized he was serious. The Defendant reached up under her shirt and fondled her breasts for approximately two minutes. Neither said anything while this was happening. When the Defendant was done, he simply left the room without saying anything. A.M. recalled that she did not "really know what was going on" and that "it was surreal to [her] that it really had just happened." She was then allowed to meet her friends to see the movie, and she returned home around 10:30 p.m.

The Defendant touched A.M. inappropriately a second time later that summer. When she arrived home one evening, her mother told her to go into her parents' bedroom because her father, who was in bed watching television, wanted to speak with her. A.M. explained that, because her father worked early hours, he went to bed very early, and she and her sisters frequently had to speak with him in bed if they needed him in the evening. As she entered her parents' room, the Defendant said, "[S]it down so we can talk." A.M. sat down on the edge of the bed, and the Defendant began stroking her. The Defendant smelled of alcohol, which was common as the Defendant drank every evening upon returning from work. Continuing to stroke A.M., the Defendant lifted A.M.'s shirt and put his mouth on her breasts. At this point, A.M. pulled away and stared at the Defendant. He said, "We're done," and A.M. left the room. A.M. explained that she did not scream when this happened because "it was just surreal . . . that it was happening." She explained, "Like you see it on T-V but you don't ever think it will happen, so it's kind of you don't know how to react."

A.M. could not recall whether the third instance of sexual contact occurred later the same summer or in the summer of 2006, but believed she had already turned sixteen when it occurred. Explaining that her father was a dump truck driver, she recalled that the third incident occurred in her father's dump truck. A.M. had asked her father for gas money, and the Defendant responded that she would have to "ride a load with him" in order to get the gas money. Accordingly, A.M. drove her car to a quarry where her father was working, waiting for him to load his truck, and got into the truck with her father. The two drove to a job site, dropped off the Defendant's load, and, on the way back to the quarry, the Defendant began to fondle A.M. He reached through the top opening of her shirt and felt her breasts. He stopped momentarily when they met a dump truck but resumed fondling A.M. when the truck passed. When they reached the quarry, the Defendant gave A.M. the requested gas money, and she got back into her car and left.

On cross-examination, A.M. said she began living with her grandparents when she

4

was an infant. She recalled that her grandparents were slightly less strict than her parents. A.M. continued to visit her grandparents every weekend while she lived with her parents. She confirmed that, at some point before she moved out of her grandparents' house, her mother visited her and found her in bed with a boyfriend.

A.M. acknowledged that her mother was very close to the bedroom when her father fondled her on his bed and could have heard A.M. had she raised her voice. She said her father was under the covers when he fondled her, and she was seated on the edge of the bed near his hips. She reiterated that she was stunned that her father was fondling her, saying that his having fondled her once before did not diminish the event's surreal quality. She confirmed that she did not tell her mother about these events until much later.

The Defendant testified, first denying that he groped T.M. in the shower. He explained that he delivered a calf before entering the bathroom, which required him to reach his bare forearms into the heifer to extract the calf. This process left him covered in birth fluids, and he did not wish to wash himself in the kitchen where his wife was preparing supper. Instead, he used the only other sink in the house, located in the bathroom where T.M. was showering at the time. He denied that he reached into the shower and groped T.M. when he went into the bathroom.

The Defendant also denied walking up behind T.M., unfastening her bra, and touching her breasts as she stood in her bedroom. He denied each of A.M.'s accusations as well, stating, "I have never touched them girls." According to the Defendant, at each of the locations he was alleged to have inappropriately touched his daughters, their mother could easily have heard them had they called for help.

The Defendant described himself as more strict than the girls' grandparents. He testified that A.M. was dating someone in the summer of 2005 and that she was eager to leave their house because she "did not like the rules." He recalled that she had planned for a long time to move out on her eighteenth birthday.

The Defendant confirmed that A.M. now has a child of her own who she brings to visit him and his wife. He stated, however, that he was "not a big children person." He confirmed that since making the allegations in this case, A.M. had asked him for favors, such as helping her with car repair. T.M., however, who could not be in the same home as him per court order, had not returned to his home while he was present. According to the Defendant, A.M. said she wanted to "be with the family" despite the court order.

On cross-examination, the Defendant said he did not usually enter the bathroom while his daughters were showering, and he confirmed a sizeable gap existed between the wall and

the shower curtain. Though he denied that he drank every night, the Defendant acknowledged frequently having a couple drinks in the evening to help him sleep. He admitted telling T.M. she was a member of the "Itty-bitty titty committee." The Defendant said he was not a "disciplinarian," and he confirmed that his daughters ordinarily did not "raise their voice[s]" when he scolded them.

At the conclusion of trial, the trial court found the Defendant guilty of all charges: three counts of sexual battery by an authority figure against A.M. and two counts of sexual battery by an authority figure against T.M.

## B. Sentencing

At the Defendant's sentencing hearing, the following evidence was presented: The Defendant's presentence report indicated the Defendant, who was forty-three at the time of sentencing, lost his father at age eight and was raised by a series of step-fathers, none of with whom he was particularly close. He graduated from high school, but had no further academic or vocational training. He had a history of steady employment, having worked in logging for ten to twelve years and in trucking from 2003 to the time of sentencing.

The Defendant had no prior arrests or convictions. He reported consuming only one alcoholic beverage per night and denied having alcohol or substance abuse issues. He currently lived with his wife, the victims' mother, to whom he has been married for twenty-three years.

A victim impact statement from T.M. accompanied the presentence report. T.M. said that, since the sexual contact by her father, she has had nightmares "that re-enact the whole tragedy." She has felt as though "everyone ha[d] abandoned [her]." T.M. reported "uncontrollable emotions," which have disrupted her sleep and caused her to struggle in school. She concluded, "I'm very unstable emotionally. I have mood swings. I don't know how to react to many situations. It affects my everyday living."

The Defendant testified that, at the time of sentencing, T.M. was living with her grandparents, having been removed from his residence. Though he himself did not have visitation with T.M. or pay child support for her, his wife has visitation and paid child support. His third daughter, S.M., also lived with her grandparents. The Defendant said A.M. was living with her boyfriend.

The Defendant explained he was not paying child support at the time simply because the formal order setting the amount of child support had not yet been set. He testified that he had, nonetheless, continued to support his daughters financially, paying for his wife to use

their car to transport their daughters to and from school and for one daughter to participate in cheerleading.

He testified he intended to continue to comply with the order requiring him to have no contact with T.M. and would comply with the sex offender directives.

On recross-examination, the Defendant testified that, were he given the opportunity, he would ask T.M. and A.M. why they accused him of touching them. He testified that he would not apologize to them because he had nothing for which to apologize.

Tammy Massey, the Defendant's wife and the victims' mother, confirmed that the Defendant generally paid for the gas she used to transport her daughters to and from school.

The Defendant issued the following allocution statement:

> You Honor, I'd just like to say I basically get up about 5:00 every morning, go to work, come home, help around the farm. Like I say, I don't know why this happened or what–why this was done what was done, but evidently they thought they needed to pursue the matter. I–you know, I really don't understand it. I really don't. I wished I did, but I don't.

At the conclusion of the hearing, the trial court sentenced the Defendant to concurrent three year sentences for each of his three convictions committed against A.M., and to three years for each of his two convictions committed against T.M. The sentences for the convictions involving T.M. were concurrent, but to be served consecutively to the sentences involving A.M., for a total effective sentence of six years, to be served on probation. The trial court also ordered the Defendant to serve forty-eight hours in jail every two weeks for the first year of his sentence. It is from these judgments that the Defendant now appeals.

## II. Analysis

In this appeal, the Defendant contends that the evidence is insufficient to support his convictions because the evidence presented by the State is based solely upon the victim's testimony and those victims, he asserts, are accomplices to the sexual battery in that they consented to the unlawful touching. Further, he asserts that the trial court improperly imposed consecutive sentencing.

### A. Sufficiency of the Evidence

The Defendant contends the evidence was insufficient to support his convictions

because the victim testimony lacked corroboration, which he argues was necessary because his daughters were accomplices to his sexual contact. He argues that "[t]here was no testimony from either [victim] that they did not consent to the activities they described, that they were other than willing participants except with regard to the last event [involving A.M.]" He contends that, based upon what he argues was the victims' complicity in their father's conduct, the victims consented to the sexual contact and, therefore, acted as accomplices thereto.

The State responds that corroboration of the daughters' testimony was unnecessary because the evidence showed that neither daughter consented to the sexual contact and, thus, they could not have been accomplices to the Defendant's conduct. In support of its position that the evidence established that the contact was non-consensual, the State cites the girls' testimony that they were "shocked" by their father's conduct and that, in several instances, they forcefully resisted their father's advances. It also cites the Defendant's failure to argue at trial that his daughters consented to his sexual contact. The State argues further that, even had the evidence shown the victims were accomplices, the Defendant failed to request that the trial court determine whether either victim was an accomplice to the Defendant's conduct and, thereby, waived his ability to object to the victims' testimony as being uncorroborated.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.w.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (1958)).

In determining the sufficiency of the evidence, this Court will not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *see also Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the

weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000). Importantly, the credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. *Bland*, 958 S.W.2d at 659.

Generally, a defendant may be convicted upon the uncorroborated testimony of one witness. *Letner v. State*, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974). However, a conviction may not be based solely upon the uncorroborated testimony of an accomplice. *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964); *State v. Green*, 915 S.W.2d 827, 830 (Tenn. Crim. App. 1995). "An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). The victim of a sex offense may, in some circumstances, be an accomplice to the sex offense.[2] *See Shelley v. State*, 31 S.W.492 (Tenn. 1895); *State v. Scott*, 338 S.W.2d 581 (Tenn. 1960); *State v. Ballinger*, 93 S.W.3d 881, 878-88 (Tenn. Crim. App. 2000). Though whether an individual is an accomplice to an offense

---

[2]We note that, per Tennessee statute, a child sex abuse victim under age thirteen is not, under any circumstances, an accomplice to illicit sexual conduct. T.C.A. § 40-17-121 (2006).

generally depends on whether the individual could be indicted for the offense, whether a sex crime victim is an accomplice appears, under current law, to depend on whether the victim voluntarily consented to the sexual activity.[3] *Scott*, 338 S.W.2d at 583. A victim consenting in response to rape, force, threats, fraud, or undue influence, however, does not voluntarily consent to the sexual conduct and is not an accomplice thereto. *Id*. Though a victim's precise role in an episode of sexual abuse is a factual determination, whether the role amounted to that of an accomplice is a question of law. *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997).

In cases where, based upon his or her role in a sex offense, a victim could be indicted for the offense charged against the defendant, the victim clearly is an accomplice to the sexual conduct at issue. *See State v. John Jason Burda*, No. M2009-02523-CCA-R3-CD, 2009 Wl 1181349, at *11 (Tenn. Crim. App., at Nashville, May 4, 2009) (victim in sexual exploitation of minor case held to be accomplice where she sent sexually explicit photographs of herself to defendant), *perm. app. denied* (Tenn. Nov. 23, 2009). The 1895 case first subjecting sex victim testimony to accomplice scrutiny involved an uncle accused of committing incest with his niece. *See Shelley*, 31 S.W. at 493. Because the relationship endured over a nine-month period with no evidence of force, threats, fraud, or undue influence, the Court concluded that the niece, who also could be convicted of incest, was an

---

[3]In *State v. Jeffrey Edward Pitts*, a panel of this Court sharply criticized the rule subjecting victim testimony to accomplice scrutiny:

> We are perplexed as to how a "victim" can be an "accomplice" under any circumstance. The two terms are mutually exclusive under Tennessee law. A "victim" is statutorily defined as "the person alleged to have been subjected to criminal sexual conduct." Tenn. Code Ann. § 39-13-501(8) (1991) (emphasis added). However, an "accomplice" is one who "knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995) (emphasis added). Furthermore, the "test" to determine if a person is an accomplice to an offense is whether that person could be indicted for or convicted of that offense. *State v. Green*, 915 S.W.2d at 831; *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990).

No. 01C01-9701-CC-00003, 1999 WL 144744, *5, footnote 7 (Tenn. Crim. App., at Nashville, Mar. 18, 1999), *perm. app. denied* (Tenn. Oct. 11, 1999). We share the *Pitts* panel's misgivings as to the cases classifying sex crime victims as accomplices. We are unable to conceive of a scenario under which a true *victim* of a sex crime, in the sense that he or she could not also be indicted for the sex crime, would, in a legal sense, voluntarily consent to sexual conduct in a way that should expose his or her testimony to additional scrutiny. Further, we can readily conceive of a scenario in which a victim might, in order to protect herself or her family, "knowingly unite" with the perpetrator of a sexual crime in exchange for the perpetrator's agreement to refrain from harming others. We fail to see the logic in refusing to allow the perpetrator of that crime to be convicted based solely upon the victim's testimony.

10

accomplice. *Id*.

Where a victim's conduct is not itself illicit, however, the victim's complicity in sexual conduct is less obvious. In *Ballinger*, for example, a fifteen-year-old victim testified that her adult neighbor had sex with her against her will, whereas the neighbor testified the sex was consensual. 93 S.W.3d at 885. This court held that a jury could reasonably conclude from the Defendant's testimony that the victim consented to the sexual activity and, thus, was an accomplice thereto. *Id*. at 887-88. In *Pitts*, however, this Court held that a mentally disabled male victim forced to perform oral sex upon his supervisor was not an accomplice to sexual battery primarily due to his mental defect but also due to his testimony that he engaged in the sexual conduct only because the defendant was his "boss" and he had been directed to do whatever his boss told him to do. 1999 WL 144744, *6.

The Defendant in this case was convicted of five counts of sexual battery by an authority figure. The Tennessee Code Annotated defines the crime of sexual battery by an authority figure as:

> (a) . . . [U]nlawful sexual contact with a victim by the defendant, or the defendant by a victim, accompanied by the following circumstances:
>
> > (1) [T]he victim was, at the time of the offense, thirteen (13) years of age or older, but less than eighteen (18) years of age, and:
> >
> > . . .
> >
> > (3)(A) The defendant was at the time of the offense in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used such power to accomplish the sexual contact.

T.C.A. § 39-13-527(a) (2006). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6) (2006). "'Intimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." T.C.A. § 39-13-501(2) (2006).

We note the Defendant did not call the trial court's attention to his concerns with the

11

victims' testimony. In choosing not to object to their testimony on this basis, he failed "to take whatever action reasonably necessary to prevent or nullify the harmful effect" of their testimony. *See* Tenn. R. App. P. 36(a). Such an objection, of course, would have been at odds with the Defendant's denial that any sexual contact took place. In choosing to pursue this course at trial and, as a result, refraining from raising an objection at trial to the uncorroborated "accomplice" testimony, the Defendant deprived the trial court of the opportunity to address the issue of accomplice testimony and, if the victims were accomplices, the need for corroboration. Consequently, the Defendant waived review of whether the trial court erred when it placed no findings on the record as to whether the victims were accomplices. *See* Tenn. R. App. P. 36(a). As such, we will address the Defendant's objection only as it relates to the sufficiency of the evidence supporting his convictions and not as it relates to the absence of findings as to whether the victims were accomplices.

The facts established at trial eliminate the possibility that the victims in this case were accomplices to the acts of sexual battery committed by the Defendant. First, neither daughter could be indicted for or convicted of sexual battery by an authority figure. The Defendant initiated sexual contact with his daughters. Nothing in the record suggests the victims either initiated sexual contact or encouraged their father's sexual advances. In short, the nature of the sexual behavior in this case was one-sided. Thus, neither victim "with common intent unite[d]" with the Defendant in committing sexual battery. *Allen*, 976 S.W.2d at 666. Under the traditional test for an accomplice relationship, therefore, neither victim was an accomplice to the Defendant's conduct.

Additionally, the victims were not accomplices according to the language of courts classifying sex crime victims as accomplices. The Defendant accomplished his sexual battery of the victims through the use, alternatively, of surprise and threats. On two of the three occasions the Defendant fondled A.M., he threatened to not allow her to visit friends and to deny her gas money if A.M. did not allow the Defendant to "touch" her. On the second occasion of fondling, there is no evidence that A.M. acquiesced to the touching; rather, the evidence proved she pulled away from the Defendant. On the other two occasions, A.M. allowed the Defendant to touch her only under the threat of privileges and money being withheld. Were the actors in this case adults, bargaining for sexual acts, the bartering that took place in this case may have lent a more voluntary tone to A.M.'s behavior. The Defendant and victim, however, were father and daughter, and, as such, the bargaining that took place was an abuse of the parental relationship by the Defendant. A.M.'s consent was coerced rather than voluntary, and her testimony regarding these events need not be regarded as that of an accomplice. *See Scott*, 338 S.W.2d at 583.

The remaining occasions involve sudden, unanticipated behavior by the Defendant

12

either immediately rebuffed or rebuffed as soon as the victim recovered from the "shock" of her father's conduct. When the Defendant fondled and placed his mouth on A.M.'s breasts while she was seated on his bed, A.M. soon pulled away and gave her father a disapproving look. The first time the Defendant groped T.M. in her bedroom, she pushed him away as soon as she recovered from the shock of her father touching her. The second time the Defendant groped T.M., while she was showering, T.M. immediately pushed her father away. Thus, the victims showed their unmistakable objection to the Defendant's conduct. In no way did either victim's behavior indicate she "voluntarily consented to" have sexual contact with their father. *See Scott*, 338 S.W.2d at 583. As such, the victims were not accomplices to the Defendant's behavior on these remaining occasions.

We note further that, whereas the defendant in *Ballinger* testified that his sexual contact with the minor victim was consensual, the Defendant in this case denied any sexual contact occurred and, thus, deprived the trier of fact of evidence upon which to find that the victims consented to the sexual contact. 93 S.W.3d at 885. Therefore, the *Ballinger* rationale for concluding that the victim in that case was an accomplice does not require a similar finding in this case. *Id.* Instead, the facts of this case more closely resemble those of *Pitts*, where the supervisor of a mentally defective adult victim ordered the victim to perform oral sex. 1999 WL 144744, *6. This case, like *Pitts*, involves a defendant who shared a relationship of trust and authority with the victims, who, like the victim in *Pitts*, were extraordinarily vulnerable due to their young age. *Id.* As such, the victims in this case, just as the victim in *Pitts*, were not accomplices to their aggressor's conduct.

In sum, we conclude that, proof of the daughters' consent to their father's conduct being absent in this case, the record could not support a finding that they were accomplices to the Defendant's conduct. Thus, corroboration of their testimony was unnecessary, and the trial court properly relied upon it in reaching its verdicts of guilt as to the charges against the Defendant. *Letner*, 512 S.W.2d at 649.

As to the Defendant's remaining argument that the trial court was not entitled to discredit the Defendant's denial that any sexual contact occurred and instead credit his daughters' detailed accounts of his behavior, the Defendant is simply incorrect. "[T]he credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact." *Bland*, 958 S.W.2d at 659. As such, the trial court was well within its discretion when it credited the girls' account of their father's behavior.

The evidence showed that the Defendant, when each victim was between thirteen and eighteen and lived under his and their mother's supervision, fondled A.M.'s breasts on three occasions and T.M.'s breasts on two occasions. The Defendant, therefore, had unlawful

13

sexual contact with the victims at a time when he had "parental or custodial authority" over the victims. *See* T.C.A. § 39-13-527(a)(3)(B). Thus, the evidence was sufficient to support the Defendant's five convictions for sexual battery by an authority figure. T.C.A. § 39-13-527(a)(1). He is not entitled to relief on this issue.

## B. Sentencing

The Defendant contends that the trial court erred in imposing consecutive sentencing based upon factor (5), that the Defendant was convicted of two offenses involving sexual abuse of a minor, accompanied by at least one aggravating circumstance. T.C.A. § 40-35-115(b)(5). Though the trial court did not identify the aggravating circumstance it found to exist, the Defendant argues the record would only support application of aggravating circumstance (a), that the relationship between the defendant and victim aggravated the conduct's harmful effect. He argues, however, that, by increasing the Defendant's sentence based upon a factor that was already an element of his offense, the trial court subjected the Defendant to multiple punishments for the same crime, in violation of his constitutional right against double jeopardy. The Defendant also contends the trial court's failure to explicitly state on the record that the resulting consecutive sentence was "justly deserved in relation to the seriousness of [the Defendant's] offense" requires reversal of its sentencing order.

The State responds first that, without regard to the Defendant's relationship with the victims, the two-year span of the Defendant's conduct and the conduct's effect upon the girls' emotional stability support application of consecutive sentencing factor (5). He argues that, even absent these aggravating circumstances, the trial court's imposition of consecutive sentencing based upon the Defendant's relationship with the victims was proper because, whereas the Tennessee Code constrains courts from applying an enhancement factor that is already an essential element of the offense, it does not impose the same restraint on consecutive sentencing factors.

As the parties' divergent arguments indicate, whether consecutive sentences were properly imposed in this case involves two inquiries: (1) whether Tennessee statute allows for the consecutive alignment of sentences based upon a factor that is already an essential element of the offense; and (2) whether such an imposition of consecutive sentences violates the Defendant's rights against double jeopardy.

## 1. Whether State Law Permits Consecutive Sentencing in this Case

If an offender meets one or more statutory criteria in Tennessee Code Annotated section 40-35-115, whether or not he should be sentenced consecutively or concurrently is within the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn.

14

Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of seven factors exists. T.C.A. § 40-35-115(b)(1)-(7). The factor relevant to this case is factor (5):

> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

T.C.A. § 40-35-115(b)(5).

In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), 103(2); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

Although Tennessee Code Annotated section 40-35-114 prohibits the use of an "essential element of the offense" as an enhancement factor, the consecutive sentencing provisions reproduced above contain no such prohibition. T.C.A. § 40-35-115. Therefore, the fact that a defendant's relationship with his victims supported his conviction is "irrelevant for purposes of consecutive sentencing." *State v. Lane*, 3 S.W.3d 456, 460 n.4 (Tenn. 1999). Because the Tennessee Code permits the imposition of consecutive sentencing based upon factor (5) even where a defendant's relationship with the victims was already an essential element of the offense, we conclude Tennessee law supports the trial court's imposition of consecutive sentencing in this case. *See* T.C.A. § 40-35-115. We turn to consider the constitutionality of the trial court's order.

### 2. Whether Double Jeopardy Bars Consecutive Sentencing

The double jeopardy clause in the United States Constitution provides that no person "shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend V. Similarly, the Tennessee Constitution states that "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Three fundamental principles underlie double jeopardy: (1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense. *State v. Burris*, 40 S.W.3d 520, 524 (Tenn. Crim. App.2000). In the context of multiple punishment, "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater

punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983).

This case concerns the double jeopardy clause's protection against multiple punishments for the same offense. The Defendant contends that, by imposing consecutive sentencing based upon the Defendant's parental relationship with the victims, already an essential element of his convictions, the Defendant received multiple punishments for the same offense. We disagree. The Defendant did not receive "multiple" punishments for the "same" offense. Rather, he was ordered to serve the sentence he received from his acts of sexual battery against one of his daughters consecutively to the sentence he received for the similar acts he committed against his other daughter. For purposes of the double jeopardy clause, these offenses were not the "same offense"; therefore, the consecutive alignment of their resulting sentences does not implicate the double jeopardy clause. Because the double jeopardy clause does not proscribe the imposition of multiple punishments for separate offenses, the imposition of consecutive sentencing in this case did not violate the Defendant's right against double jeopardy. *See Burris*, 40 S.W.3d at 524.

Having concluded that the trial court's order of consecutive sentencing neither ran afoul of Tennessee sentencing provisions nor violated the Defendant's constitutional right against double jeopardy, we conclude the trial court properly sentenced the Defendant to two consecutive three-year sentences of probation, for a total effective sentence of six years on probation, with service in jail of forty-eight hours every two weeks for the first year of his sentence. He is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the evidence was sufficient to support the Defendant's convictions and that the trial court properly imposed consecutive sentencing. As such, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

16